UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                          :
VADIM SHULMAN, an individual                 :
                                                          :
              Plaintiff,                               :         Cause No.
                                                          :
        v.                                                :
                                                          :
PIERCE ATWOOD, LLP, a limited liability  :
partnership; JOHN A. STEN, an individual;  :
SCOTT E. PUESCHEL, an individual,          :
                                                          :   [REQUEST FOR JURY TRIAL]
                                                          :
              Defendants.                            :
_____:

## COMPLAINT

Plaintiff VADIM SHULMAN hereby files this Complaint for Breach of Contract,

Professional Negligence and Breach of Fiduciary Duties, and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action based upon the actions of Massachusetts licensed attorneys

arising out of their representation of Plaintiff Vadim Shulman ("Shulman").  Shulman hired

Defendants to represent him in connection with his investment in a company called Pathway

Genomics Corporation ("Pathway").  Shulman lived and continues to live in Europe and relied

on attorneys he would retain for legal guidance on all his investments in the United States.  As

Pathway was failing, Shulman retained Defendants as legal counsel to advise and structure his

options as the majority shareholder of Pathway.  Defendants counseled, advised, structured and

ultimately conducted an Article 9 sale of the assets of Pathway.  However, and despite such

1

advice, it was determined through subsequent legal scrutiny that the Article 9 sale was flawed and conducted improperly, resulting in damages to Shulman in excess of $1,849,437.93.  In addition, Shulman is informed and believes that Defendants' advice to proceed with an Article 9 sale itself was negligent insofar as there were other options that were far more prudent and beneficial to Shulman.

**PARTIES**

2.      Plaintiff, Vadim Shulman ("Shulman" or "Plaintiff") is, and at all relevant times hereto was, an individual residing outside of the United States of America, in Monaco.  Shulman speaks, reads and writes very little English and has never lived in United States, outside of short visits.

3.      Defendant Pierce Atwood, LLP ("Pierce Atwood") is, and at all relevant times hereto was, a limited liability partnership.  Pierce Atwood is a law firm that maintains offices in, among other states, Massachusetts.  At the time of the events herein, Plaintiff is informed and believes that attorneys John A. Sten and Scott E. Pueschel, who were providing advice and counsel to Shulman, were attorneys working at Pierce Atwood's Massachusetts office.

4.      Defendant John A. Sten ("Sten") is, and at all relevant times hereto was, an attorney duly licensed by the Commonwealth of Massachusetts, and admitted to the bar in December 1995.  At the time of the events relating to this Complaint, Sten was an attorney working for, or on behalf of, Pierce Atwood and working from its Boston, Massachusetts office.

5.      Defendant Scott E. Pueschel ("Pueschel") is, and at all relevant times hereto was, an attorney duly licensed by the Commonwealth of Massachusetts, and admitted to the bar in December 1993.  Plaintiff is informed and believes and based thereon alleges that at the time of

the events relating to this Complaint, Pueschel was an attorney working for, or on behalf of,

Pierce Atwood, and working from its Boston, Massachusetts office.

## JURISDICTION AND VENUE

6.      The Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

7.      Venue is proper in the Commonwealth of Massachusetts pursuant to 28 U.S.C. §1391 because the establishment of the attorney-client relationship by and between Shulman and attorneys Sten, Pueschel and Pierce Atwood occurred in the Commonwealth of Massachusetts, and was done in accordance with Massachusetts law.  The engagement agreement between Shulman and Pierce Atwood was entered into from Pierce Atwood's office located at 100 Summer Street, Boston, Massachusetts.  In addition, the attorneys representing Shulman were licensed by the Commonwealth of Massachusetts.

## RELEVANT FACTS

**A.      Pathway Genomics Corporation**

8.      Pathway Genomics Corporation ("Pathway") was a Delaware corporation formed in 2008 by its founder, James Plante.  Pathway's business model was to provide genetic testing to consumers to alert them of potential health risks.  After its formation, Pathway raised several rounds of preferred equity financing.

9.      Shulman learned of Pathway in 2011 after he was introduced to Plante. Captivated by Pathway's mission, Shulman began investing in the company in 2012.  He

continued to invest over the years to the extent that in March 2016 Shulman was the largest capital investor in Pathway, holding 24% of Pathway's preferred stock, and 17.22% of Pathway's total outstanding stock (15.07% on a fully diluted basis).

10.    After Shulman's investment in Pathway, the company's financial condition significantly deteriorated due to multiple operational challenges.  Its revenue fell from $12.7 million in 2015 to $6.7 million in 2017.  During that same time period, its cash balance dropped from $19.9 million in 2015 to $448,000 in 2017.

11.    In 2017, displeased with Plante and with how Plante was managing Pathway, Shulman purchased James Plante's interest in Pathway pursuant to a Purchase and Sale Agreement.  Plante proceeded to step down as CEO but remained on the Board of Directors. Later, Shulman would sue Plante for misrepresentations in connection with the Purchase and Sale Agreement, and the Purchase and Sale Agreement would be voided.  Nevertheless, from that point on, Shulman would remain the sole source of capital and financing for Pathway.

12.    Sulman became a member of the Board of Directors of Pathway in 2017.  He maintained a seat on the Board of Directors, along with Plante and several other individuals.

13.    As of 2014, all attempts to secure equity financing for Pathway failed.  Shulman was the only individual willing to contribute money to keep the company doors open, and he did so to the tune of millions of dollars.  Shulman made various loans to Pathway, shifting his money from equity to debt financing.

14.    In 2017, Shulman signed a security agreement with Pathway ("2017 Security Agreement"), which was counter-signed by Pathway's general counsel, Jeffrey Chin.  The 2017 Security Agreement concerned $8 million dollars of Subordinated Convertible Promissory Notes between Shulman and Pathway.

4

15. Between 2017 and 2019, there was a series of changes to Pathway's Board of Directors, with certain individuals being elected, and others resigning. As of October 2018, the Board of Directors consisted of Shulman, General Peter Pace, Glenn Braunstein, Sonny Bhatia, Reza Jafari, and possibly Vladimir Klitschiko.

16. In February 2019, Shulman notified the Board of Directors of his intent to resign as Chairman, President and CEO. He informed Pathway's Board that he was unable to continue financing Pathway. After doing so, Braunstein, Pace, Jafari and Bhatia almost immediately resigned from the Board of Directors.

17. In 2019, Shulman executed a second security agreement ("2019 Security Agreement"). The 2019 Security Agreement re-securitized the prior $8 million of Notes reflected in the 2017 Security Agreement, as well as other notes and new advances in 2018 and 2019 totaling over $12 million dollars. The 2019 Security Agreement was counter-signed on behalf of Pathway by Michael Nova, Pathway's Chief Innovation Officer.

18. In April 2019, Shulman was aware that the writing was on the wall. He had invested over $100 million in Pathway as equity and debt, but he could no longer finance the company. He needed a solution to recover a portion of his investment, if possible, and certainly advice and counsel as to how to proceed

**B.     Hiring of Pierce Atwood**

19. In order to determine his options, in March 2019 Shulman was referred to John A. Sten through a mutual acquaintance. The purpose of the referral was to locate and retain counsel to assist with a reorganization of Pathway or to advise Shulman of his options as the largest shareholder who had loaned enormous sums to the company. Sten was provided  background information about the issues, and was told that Shulman was interested in putting Pathway into

liquidation and to secure all remaining assets, or as a backup to dilute the other shareholders by converting Shulman's Promissory Notes and initiate a new equity round. Defendants were informed that Shulman contributed both debt and equity exceeding a hundred million dollars. Defendants acknowledged that they were retained to assess the situation with Pathway and then help Shulman find a solution.

20.     Sten was also informed early on about concerns with respect to Shulman's Promissory Notes, securities agreement, board issues, and potential options, including bankruptcy.

21.     In interacting with Shulman, Sten observed that Shulman's English was limited, and therefore his communications were through a third party, Tanya Ferree, who would interpret their conversations throughout the representation. Ferree is a Ukrainian trained woman who lived in the United Kingdom and is fluent in English and Russian, which is one of Shulman's native languages.

22.     After a few weeks of communications, Shulman ultimately hired John Sten and Pierce Atwood, LLP on Apil 5, 2019. Unbeknownst to Shulman, Sten did not have any experience in Article 9 sales. Indeed, the Pathway Article 9 sale was the only Article 9 sale that Sten had ever been involved in, and during the course of his representation, he reached out to lawyers at other firms to get educated on the Article 9 process. However, in the Engagement Agreement, Sten represented that he would be the attorney "primarily responsible for this Matter."

23.     Nevertheless, and without disclosing his lack of familiarity with reorganizations, Sten provided Shulman with an Engagement Agreement for Shulman to sign. As reflected in the Engagement Agreement, Pierce Atwood was hired to "provide [] advice and counsel concerning

[Shulman's] investment in Pathway Genomics Corporation." The Engagement Agreement also indicated that Scott Pueschel would be overseeing the corporate aspects of the engagement.

24. At the time, Defendants were informed that the Board of Directors consisted of only two individuals, Shulman and his friend. Defendants were also told that there were no independent Board members.

25. Pueschel informed Shulman that Pathway needed an independent board of directors to proceed with any reorganization plan or other options. In order to secure new board members, Pueschel informed Shulman that he should have one of his friends or business contacts act as the independent director. According to Pueschel, the key was that the independent director not be an investor in Pathways.

26. Defendants were informed that Shulman had invested millions of dollars into Pathway and spent millions more keeping it running, but Pathways was a "mess" and Shulman needed help.

27. Defendants advised and counseled Shulman on the manner in which to proceed, including correspondence to shareholders of Pathway and representations to be made in such communications. Sten was informed by his colleague at another law firm that options included a bankruptcy sale, receivership sale, or Article 9 process.

28. Through the advice of Defendants, Pathway's shareholders were informed in or about May 2019 of a potential recapitalization. That refinancing plan, however, was then abandoned when Defendants learned that a recapitalization could not occur.

29. Between in or about the end of June 2019 and December 2019, no further action was pursued by Shulman or Defendants. Matters went silent. Then, in December 2019, Defendants reengaged. Defendants were informed that Shulman desired to proceed with the

Article 9 sales process.  Defendants understood that Shulman was relying on them to shepherd him through the process.  Defendants further knew that Shulman was relying on Defendants to make sure that the Article 9 process was handled fairly and appropriately, in compliance with the law.

30.    Before proceeding with the Article 9 process, Defendants knew that from their experience with other Pathway shareholders, there would be potential challenges to the Article 9 sale.  Defendants, therefore, discussed with Shulman best practices and recommendations on how to proceed, and then informed Shulman that they would handle the Article 9 sale properly and in accordance with the law.

31.    Notably, however, after his retention, Sten never informed Shulman regarding any duties that he may have owed to Pathway shareholders.  Nor did Sten advise Shulman as to any considerations that should be taken into account in connection with an Article 9 sale resulting from Shulman's status as a secured lender.

32.    Defendants were aware that Shulman had been burned in the past, and had been the victim because others had not performed properly.  Defendants assured Shulman, and Shulman wanted to make sure that everything was done correctly.  Shulman informed Defendants that he wanted the Article 9 process to be conducted legally and appropriately.

33.    Defendants then prepared the Notice of Sale Process on January 8, 2020, as well as all documents relating to the Article 9 sale.  Defendants also prepared the bill of sale, patent assignment and trademark assignment.  The Article 9 sale proceeded, and Shulman was the sole bidder at the sale, receiving all of the assets of Pathway.

**C.    The Shareholder Litigation**

34.    After the completion of the Article 9 sale, two Pathway shareholders, Neem

International CV and ALJ Holdings Ltd. filed a lawsuit in Delaware before the Court of Chancery against Shulman ("Neem Shareholder Lawsuit") in February 2022.  The complaint was amended in October 2022 by a Verified Amended Complaint, which was the operative pleading.  The Amended Complaint contained thirteen counts, ten of which were derivative claims, and three direct counts.

35.    In the Neem Shareholder Lawsuit, plaintiffs Neem International CV and ALJ Holdings purchased Series E-1 stock in Pathway.  As Series E-1 preferred stockholders, such plaintiffs were entitled to certain liquidation preference rights pursuant to Article IV, Section B.(2)(d) of the Company's Restated Certificate such that upon the liquidation of Pathway's assets, such entities were entitled to a preferential recovery.

36.    Defendants were aware of Neem International CV, and its shareholder interest in Pathway.  Prior to the Article 9 sale, Defendants communicated with Neem in an attempt to obtain their cooperation and enter into a cooperative agreement.

37.    The plaintiffs in the Neem Shareholder Lawsuit asserted that the Article 9 foreclosure sale was flawed and unlawful.  The plaintiffs alleged that: (a) there is no evidence that the Board convened during this time or that the Board considered possible alternatives to avoid a foreclosure and sale of all of the Company's assets; (b) the sale was not on commercially reasonable terms; (c) there was no notice to prospective buyers; (d) the sale was not done in a recognized market; and (e) the sale was completed in less than thirty days.

38.    In addition, the plaintiffs contended that through such sale and disposition of Pathway's assets to Shulman, they were deprived of their preference rights under provision Article IV, Sections B.2(c)(iv) and B.(5)(a)(v) of the Restated Certificate.

39.    The claims in the Neem Shareholder Lawsuit included Breach of Fiduciary Duty,

Fraudulent Conveyance, Violation of UCC Article 9, Fraud, Unjust Enrichment, and Breach of Amended Certificate.

40. The trial of the Neem Shareholder Lawsuit proceeded from December 9 to 13, 2024. Post-trial briefing and argument concluded in May 2025. Supplemental briefing was therefore completed in September 2025. On December 31, 2025, the Chancery Court rendered it ruling.

41. Following the hearing of evidence and argument of counsel, the Chancery Court found against Shulman, and awarded damages in the sum of $1,849,437.93, plus interest, and potentially an award of attorney's fees.

42. In reaching its decision, the Chancery Court ruled that the plaintiffs preference rights were breached in connection with the Article 9 sale. "The Article 9 sale constituted a Deemed Liquidation Event as defined in the Restated Certificate." Because the sale triggered plaintiffs' liquidation preference rights, they were entitled to priority payment, which they did not receive.

43. In addition, Article 9 sales are reviewable under the entre fairness standard of review, meaning that the transaction must be fair as to both process and price. The Chancery Court opined that the Article 9 sale here was orchestrated as such that it "was unfair at every step of [the] analysis."

44. Although conducted under the advice and counsel of Defendants, the Chancery Court ruled that (a) "Shulman exercised complete control over the timing and initiation of the Article 9 sale"; and (b) "[t]he foreclosure was not the result of a deliberative Board decision to wind down an insolvent entity, but a calculated confiscation initiated by a conflicted fiduciary."

45. Further, the Chancery Court ruled that the Article 9 structure "was fundamentally

10

unfair because the underlying debt was unauthorized and unenforceable."

46.    Moreover, the Chancery Court determined that "the process lacked any semblance of arm's-length bargaining."  The fairness opinion did not exist until weeks after the transaction was announced, and there was  complete lack of independence.  According to the Chancery Court in its decision, "there was nothing commercially reasonable about the transaction."

47.    The Chancery Court further mentioned that Defendants were aware of the steps for an Article 9 sale, including at least four weeks spent on advertising the sale and communicating with potential bidders, but that was not done.

48.    As a result, Shulman, who Defendants admit relied upon them and their professed expertise, to conduct a proper Article 9 sale, compliant with the law, was found liable for violating the preferential rights of plaintiffs in the Neem Shareholder Lawsuit, and for performing an Article 9 sale which was violative of the law.  Defendants, however, did not review or consider the preferential rights of other shareholders.

49.    Shulman is further informed and believes that there was a better, safer alternative to an Article 9 sale that should have been pursued, and which would not have subjected Shulman to liability.

50.    Shulman believes that the actions and inactions of Defendants, jointly and severally, were negligent and constituted a breach of their fiduciary duty to Shulman,  As a result of such conduct, Shulman was damaged in the amount of $1,849,437.93, plus prejudgment interest accruing from January 22, 2020, attorneys' fees and costs incurred by Shulman of his own counsel in connection with the Neem Shareholder Lawsuit, as well as potentially those of plaintiffs' counsel in the Neem Shareholder Lawsuit, according to proof at trial.

## COUNT I

## BREACH OF CONTRACT

### (Against Defendants Pierce Atwood and Sten)

51.    Plaintiff incorporates by this reference paragraphs 1 through 50, inclusive hereof, as if set forth in full hereat.

52.    On April 5, 2019, Shulman entered into a written Engagement Agreement with Defendants Sten and Pierce Atwood relating to his representation with respect to Shulman's investment in Pathway.

53.    Shulman performed all obligations required of him pursuant to the Engagement Agreement with Defendants, except as excused from performing by reason of the breach of the Engagement Agreement by Defendants.

54.    Defendants breached the Engagement Agreement by failing to act properly, professionally and in accordance with the obligations under the terms of the Engagement Agreement, as alleged herein above.

55.    On February 19, 2025, Shulman and Defendants entered into an Agreement Tolling Limitations Period ("Tolling Agreement").  The Tolling Agreement was subsequently amended to extend the limitations period, and expires March 19, 2026.  As a result, the limitations period for bringing the instant action was extended to March 19, 2026.

56.    As a direct and proximate result of the breach of the Engagement Agreement, Shulman has sustained damages including, but not limited to, the following: (a) $1,849,437.93, plus prejudgment interest accruing from January 22, 2020; (b) attorneys' fees and costs incurred by Shulman of his own counsel in connection with the Neem Shareholder Lawsuit; and (c) potentially those of plaintiffs' counsel in the Neem Shareholder Lawsuit.

## COUNT II

## PROFESSIONAL NEGLIGENCE

### (Against All Defendants)

57.    Plaintiff incorporates by this reference paragraphs 1 through 50, inclusive hereof, as if set forth in full hereat.

58.    On April 5, 2019, Shulman entered into a written Engagement Agreement with Defendants Sten and Pierce Atwood relating to his representation with respect to Shulman's investment in Pathway.  Such representation included Defendants' advice and counsel concerning Shulman's rights and remedies with respect to his investment in Pathway.

59.    In Massachusetts, when an attorney agrees to represent a client in a legal matter, that attorney, by entering into an attorney-client relationship, makes certain implied representations and warranties concerning the attorney's competence and skills.  Such attorney also undertakes duties to the client.

60.    The Massachusetts Rules of Professional Conduct Rule 1.1 Competence provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."  In addition, Rule 3.6 of the Massachusetts Rules of Professional Conduct states the general standard requiring attorneys "to employ reasonable care and skill and apply the lawyer's best judgment in the performance of professional services".

61.    Defendants were aware that Shulman had hired them to assess and address his issues concerning his investment in Pathway.  Defendants were further informed that Shulman was relying upon them to conduct a proper, and lawful Article 9 sale, if that was the best avenue to proceed.

13

62.    Defendants, however, were negligent in their representation of Shulman by, but not limited to:

- Failing to disclose that Sten had never previously performed any Article 9 sales transaction;

- Failing to properly advise Shulman as to his fiduciary obligations to other shareholders;

- Failing to review the stock certificate of other shareholders to determine any restrictions or preferential interest;

- Failing to prepare the proper documentation for an Article 9 sale;

- Failing to provide competent advice and counsel concerning an Article 9 sale;

- Failing to perform the Article 9 sale properly and in accordance with the law;

- Failing to consider and pursue better and more viable options given Shulman's position with respect to equity and debt;

63.    On February 19, 2025, Shulman and Defendants entered into an Agreement Tolling Limitations Period ("Tolling Agreement").  The Tolling Agreement was subsequently amended to extend the limitations period, and expires March 19, 2026.  As a result, the limitations period for bringing the instant action was extended to March 19, 2026.

64.    As a direct and proximate result of the breach of the Engagement Agreement, Shulman has sustained damages including, but not limited to, the following: (a) $1,849,437.93, plus prejudgment interest accruing from January 22, 2020; (b) attorneys' fees and costs incurred by Shulman of his own counsel in connection with the Neem Shareholder Lawsuit; and (c) potentially those of plaintiffs' counsel in the Neem Shareholder Lawsuit.

## COUNT III

## <u>BREACH OF FIDUCIARY DUTY</u>

### (Against All Defendants)

65.     Plaintiff incorporates by this reference paragraphs 1 through 50, and paragraphs 58 through 64, inclusive hereof, as if set forth in full hereat.

66.     On April 5, 2019, Shulman entered into a written Engagement Agreement with Defendants Sten and Pierce Atwood relating to his representation with respect to Shulman's investment in Pathway.  Such representation included Defendants' advice and counsel concerning Shulman's rights and remedies with respect to his investment in Pathway.

67.     In Massachusetts, when an attorney agrees to represent a client in a legal matter, that attorney, by entering into an attorney-client relationship, makes certain implied representations and warranties concerning the attorney's competence and skills.  Such attorney also undertakes duties to the client.

68.     The Massachusetts Rules of Professional Conduct Rule 1.1 Competence provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."  In addition, Rule 3.6 of the Massachusetts Rules of Professional Conduct states the general standard requiring attorneys "to employ reasonable care and skill and apply the lawyer's best judgment in the performance of professional services".

69.     Defendants were aware that Shulman had hired them to assess and address his issues concerning his investment in Pathway.  Defendants were further informed that Shulman was relying upon them to conduct a proper, and lawful Article 9 sale, if that was the best avenue to proceed.

70.     Shulman reposed his trust and confidence in Defendants and entrusted them to represent him in connection with the issue with respect to Pathway, as above alleged, and based upon Defendants' representations that they had the requisite experience and expertise to do so. Defendants were aware that Shulman was reposing his trust and confidence in Defendants and was relying on them in connection with and with respect to the legal services Defendants agreed to provide.

71.     Defendants owed Shulman a fiduciary duty by virtue of the trust and reliance that Shulman placed in Defendants and Defendants' knowledge and acceptance of such trust and reliance.

72.     Defendants further owed a fiduciary duty to Shulman by way of the acceptance of the attorney-client relationship established pursuant to Massachusetts law and as memorialized by the Engagement Agreement.

73.     Defendants breached their fiduciary duty by, but not limited to:

- Failing to disclose that Sten had never previously performed any Article 9 sales transaction;

- Failing to properly advise Shulman as to his fiduciary obligations to other shareholders;

- Failing to review the stock certificate of other shareholders to determine any restrictions or preferential interest;

- Failing to prepare the proper documentation for an Article 9 sale;

- Failing to provide competent advice and counsel concerning an Article 9 sale;

- Failing to perform the Article 9 sale properly and in accordance with the law;

- Failing to consider and pursue better and more viable options given

Shulman's position with respect to equity and debt;

74. On February 19, 2025, Shulman and Defendants entered into an Agreement Tolling Limitations Period ("Tolling Agreement"). The Tolling Agreement was subsequently amended to extend the limitations period, and expires March 19, 2026. As a result, the limitations period for bringing the instant action was extended to March 19, 2026.

75. As a direct and proximate result of the breach of the Engagement Agreement, Shulman has sustained damages including, but not limited to, the following: (a) $1,849,437.93, plus prejudgment interest accruing from January 22, 2020; (b) attorneys' fees and costs incurred by Shulman of his own counsel in connection with the Neem Shareholder Lawsuit; and (c) potentially those of plaintiffs' counsel in the Neem Shareholder Lawsuit.

WHEREFORE, Plaintiff Vadim Shulman prays as follows, as to each and every count:

1. For judgment in favor of Shulman, and against Defendants, jointly and severally, for:

   a. $1,849,437.93, plus prejudgment interest accruing from January 22, 2020;

   b. attorneys' fees and costs incurred by Shulman of his own counsel in connection with the Neem Shareholder Lawsuit; and

   c. potentially those of plaintiffs' counsel in the Neem Shareholder Lawsuit.

2. For costs of suit incurred herein;

3. For attorney's fees to the extent permitted by contract or statute;

4. For such other relief as may be determined to be just, equitable and proper by the Court.

17

Date: March 17, 2026

Respectfully submitted,
VADIM SHULMAN
By his Attorney,


/s/ William H. Connolly
William H. Connolly (BBO #634501)
20 Park Plaza
Suite 1000
Boston, MA 02116
Telephone: (617) 866-8610
Email: whc@williamconnollylaw.com


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, Plaintiff Vadim Shulman

hereby demands a trial by jury on all matters that may be tried to a jury.


/s/ William H. Connolly
William H. Connolly (BBO #634501)
20 Park Plaza
Suite 1000
Boston, MA 02116
Telephone: (617) 866-8610
Email: whc@williamconnollylaw.com